|                                       |     |
| ------------------------------------- | --- |
| KIRA BOYLE - DECEMBER 12, 2022        | 52  |

1  PDF?  I'm going to try to bring all to me.  Tell me if
2  that worked.
3          MR. FRIEDMAN:  It worked on mine.
4          MS. MANBER:  Oh, lovely.
5  BY MS. MANBER:
6      Q    It's Bates stamp 2150.
7      A    Got it.
8      Q    You say here you, "Shouldn't b goin through
9  this...the panick attacks that I'm tryin to keep under
10 control r gettin worse...I can't just b left in piece to
11 do my job & go home... wtf is the point of even comin
12 into work anymore...?  I didn't have these issues as a
13 worker/foreman on the outside..."  What did you mean by
14 that, I didn't have these issues as a worker/foreman on
15 the outside?
16     A    The issues that I was dealing with with
17 Transit, the sexual harassment and abuse, the physical
18 abuse.
19     Q    And when you meant as a worker or foreman on
20 the outside, is there a specific job you're referring to
21 there?
22     A    Yes.
23     Q    What job was that?
24     A    I was a masonry foreman before I started
25 working for New York City Transit Authority.

|   |   |
|---|---|
| KIRA BOYLE - DECEMBER 12, 2022 | 53 |

1  Q   Had you ever experienced any sort of
2  harassment at any other job that you worked?
3  A   No.
4  Q   Really?
5      MR. FRIEDMAN:  Objection.
6  BY MS. MANBER:
7  Q   Had you ever filed a complaint against a prior
8  employer?
9  A   I did.  Yes.
10 Q   What was the nature of the complaint?
11 A   Sexual harassment.
12 Q   Was it more than one employer?
13 A   No.
14 Q   You just said you never experienced harassment
15 on the job though?
16 A   Yes.  On my job prior to New York City Transit
17 Authority where I was a foreman.
18 Q   Okay.  So what employer did you file the
19 complaint against?
20 A   I'm not at liberty to say that.
21 Q   A complaint is a public document.
22 A   I'm legally not at liberty to say that.
23     MR. FRIEDMAN:  Let me -- give me one
24 second.  Let's take a break.  My concern is there if
25 some sort of settlement agreement or confidentiality

|   |   |
|---|---|
| | KIRA BOYLE - DECEMBER 12, 2022         54 |

1   agreement as part of that.  Let me talk to her and see
2   what we're talking about here.
3                MS. MANBER:  All right.  Let's go off the
4   record.
5                THE COURT REPORTER:  Okay.
6         (Off the record.)
7                THE COURT REPORTER:  All right.  We are
8   now back on the record at 3:28.
9                MR. FRIEDMAN:  Okay.  I thought we were
10  going to talk off the record first and go back on the
11  record, but fine.  There appears to be what I believe a
12  confidential settlement and release about what your --
13  the prior suit I think you're going to ask her.  From
14  what I understand it was not publicly filed, but if
15  you'll agree to confidentiality, I'll allow some, within
16  reason, some questioning about it over something I think
17  is confidential, but go ahead, you can -- if an issue
18  arises, Miriam, we can talk about it.
19               MS. MANBER:  That's fine.  I appreciate
20  it, and my intention is to ask only about things that
21  are publicly filed.
22               MR. FRIEDMAN:  Okay.  So I don't think
23  what you just asked her about is publicly filed.  If
24  we're thinking -- if we're on the same page, but you
25  haven't gotten into specifics yet.

**KIRA BOYLE - DECEMBER 12, 2022** 55

1  MS. MANBER: Well, let me -- let's go
2  back and what was the last question I asked before the
3  break?
4  THE COURT REPORTER: Hang on just a
5  moment.
6  (Readback as requested.)
7  BY MS. MANBER:
8  Q  Okay. So what employer is it that you filed a
9  complaint against?
10  MR. FRIEDMAN: So just to be clear, we
11  can mark this as confidential? I don't think this is
12  publicly filed, but I'm happy just to -- so we don't
13  have to worry about coming back again or any issues, I'm
14  onboard with you getting the information as long as
15  we're covered if there -- if there was an actual
16  agreement here -- an actual release of claims executed
17  here, which I'm pretty sure there was, although I'm not
18  in possession of it now.
19  MS. MANBER: Right. But the identity of
20  an employer if a complaint was filed is public
21  knowledge?
22  MR. FRIEDMAN: It wasn't though. I mean,
23  a demand letter is not public knowledge, right? And I
24  don't even think that there was that, and she'll explain
25  why in a moment, but I'm saying that this was not, from

KIRA BOYLE - DECEMBER 12, 2022                                56

1    what I understand by counsel, that what you're asking
2    her about was not a publicly filed complaint at an
3    administrative level or in court.  This was -- what I
4    understand --
5                    MS. MANBER:  Okay.  You know what?
6                    MR. FRIEDMAN:  I don't want to -- what?
7                    MS. MANBER:  I will ask her about this.
8    We can mark it confidential, but if it turns out it's
9    publicly filed, we're going to unmark it.
10                   MR. FRIEDMAN:  A hundred percent.
11                   MS. MANBER:  Okay.
12         (Section marked confidential.)
13                   MR. FRIEDMAN:  Ask her first about the
14   basis, you know, some of the surrounding circumstances.
15   You can talk for yourself, and then we can go from
16   there, but I'm pretty sure it's not going to be a big
17   deal, you know, but I obviously I don't want to testify.
18   I'm not sure what's so confusing that.  I mean, I could
19   ask the questions right now if you'd like to get you the
20   information, but --
21   BY MS. MANBER:
22       Q    Ms. Boyle, who was the employer that filed a
23   complaint against?
24       A    So Ms. Manber, I believe in complete
25   transparency and being honest with you, and I have been

```
                    KIRA BOYLE - DECEMBER 12, 2022              57
 1   honest with you, but unfortunately, from my
 2   understanding of from what I signed, I legally cannot
 3   disclose the information to you or anyone else, and I'm
 4   not trying to give you a hard time.  It's just that from
 5   what I did sign, I believe it was some kind of like --
 6   are we on record or off of record.
 7              MR. FRIEDMAN:  We're on the record, Kira.
 8   Just finish answering the question and --
 9              THE WITNESS:  Is it confidential or not
10   confidential?
11              MS. MANBER:  It is confidential.
12              THE WITNESS:  It is confidential?
13              MR. FRIEDMAN:  Yes.  Yes.
14              THE COURT REPORTER:  It is confidential.
15              THE WITNESS:  Okay.  So what I did sign
16   was what I think to be a settlement agreement to where
17   my employer said sign this, and I signed it, and that
18   was that.  There was an individual that every day when I
19   would come into work, it was a superior who kept saying,
20   excuse my language, but fucking dyke, go do this, and
21   fucking dyke, go do that.  I mean, I really can't say
22   much more.
23              MR. FRIEDMAN:  Kira, did you file that
24   complaint in court, the one you're talking about?
25              THE WITNESS:  No.  They brought me into
```

KIRA BOYLE - DECEMBER 12, 2022                              58

1   the office.  My manager brought me into the office --
2   well, their manager's manager brought me into the office
3   and told me to sign a piece of paper and that was --
4   that was that, and they gave me a check for like $5,000.
5   BY MS. MANBER:
6        Q    And I ask you, to your knowledge, have you
7   ever had a lawyer on your behalf file a complaint in
8   court aside from the case that we're here on now?
9        A    Yes.  It was a landlord/tenant court.
10       Q    Okay.  Anything else?
11       A    No.
12       Q    You're saying you never sued a prior employer?
13       A    No.  I don't believe that went into court or
14  anything because I didn't have an attorney on the case.
15  It was literally, I went to the office, I signed the
16  paper, and they just gave me a check.
17       Q    Okay.  And that was the only prior employer
18  you had a problem with?
19       A    It is.  Yes.
20       Q    Okay.  Were there any allegations of sexual
21  assault in that case?
22       A    No.  Like I said, the person would just
23  calling me an F -- an F'ing dyke and tell me, F'ing
24  dyke, go do this and go do that, and like I said, it was
25  the manager, and I went to the manager's manager, their

|  | KIRA BOYLE - DECEMBER 12, 2022 | 59 |

1  boss, and I complained to them about it.
2      Q    Were there any allegations of sexual
3  harassment in the landlord/tenant case?
4      A    In my landlord/tenant case?
5      Q    Mm-hmm?
6      A    I'm -- okay, so this is confidential, correct?
7      Q    Correct.
8      A    Okay.  So I actually have, like I said, I
9  believe in being transparent and honest, so please take
10 that into consideration.  I actually have a low-level
11 drug dealer that lives underneath me that has followed
12 my daughter on multiple occasions that deals drugs right
13 outside of my door instead of his.  I live in a building
14 and I did file for myself and I -- I do represent myself
15 in landlord/tenant court against my landlord because of
16 this gentleman.
17          And that gentleman actually stated to me since
18 I'm being completely transparent with you because he
19 does see my girlfriend come in and out of my house, and
20 I do walk with my girlfriend, and we do hold hands and
21 everything, that if I were to come back on the straight
22 side basically, just leave it at that.  Yeah.
23     Q    Okay.  So that's the allegation for your
24 sexual orientation?
25     A    Yeah.

| | KIRA BOYLE - DECEMBER 12, 2022 | 60 |

1  Q  Okay. What court did you file that in, if you
2  remember?
3  A  This is still confidential, right, Ms. Manber?
4  Q  Mm-hmm.
5  A  The court that I filed it in is called
6  landlord/tenant Court. It's on Sutphin Boulevard in
7  Jamaica.
8  Q  In Queens?
9  A  I'm sorry. Say that again?
10 Q  In Queens?
11 A  Yes. It is.
12 Q  Okay.
13 A  But Ms. Manber, what exactly -- since we are
14 in confidentiality, what exactly does that have to do
15 with the case today though?
16         MR. FRIEDMAN: It's all right. So Kira,
17 she's --
18         THE WITNESS: I'm sorry.
19         MR. FRIEDMAN: She's the one asking the
20 questions. You and I can talk about stuff later.
21         THE WITNESS: Okay. I don't know.
22 Sorry.
23         MS. MANBER: No. No problem. I'd like
24 to take just a quick bathroom break if that's okay with
25 everyone?

```
                KIRA BOYLE - DECEMBER 12, 2022              61
 1                THE WITNESS:  That's fine.
 2                MR. FRIEDMAN:  No problem.  Kira, you can
 3    do the same, as will I.
 4          (End confidential.)
 5          (Off the record.)
 6                THE COURT REPORTER:  We're back on the
 7    record at 3:46.  Before resuming questioning, can
 8    attorneys confirm whether this was continuing
 9    confidential?
10                MS. MANBER:  We will not be.
11                THE COURT REPORTER:  Okay.  Thank you.
12    BY MS. MANBER:
13         Q    Ms. Boyle, did you ever work at a place called
14    Gaslight?
15         A    No.
16         Q    Did you ever work in restaurants?
17         A    I did.  Yes.
18         Q    Did you ever work for a place called Pete's
19    Pizzeria?
20         A    No.
21         Q    What restaurants have you worked in?
22         A    Al Dente Pizzeria/Restaurant.  It was Greek
23    and Italian cuisine.
24         Q    And where was that?
25         A    Geez, I believe it was on 46th Avenue and
```

|  | KIRA BOYLE - DECEMBER 12, 2022 | 62 |

1  Utopia Parkway.
2      Q    Did you ever work in a restaurant on 14th
3  Street in Manhattan?
4      A    No.
5      Q    Do you know Theodore Apodiacos?
6      A    No.
7      Q    Where did you work in 2012 if you remember?
8      A    How old was I in 2012?
9      Q    I don't know.  You've got to do the math on
10 that one?
11     A    The only restaurant I worked in was Al Dente
12 Pizzeria.  I was a chef.  I was a chef for a very long
13 time, and I graduated from Al Dente Pizzeria/Italian and
14 Greek cuisine to Merch, which was French, and I believe,
15 Indian cuisine.  So it was one of those two.  The first
16 one, I was probably there for a good 10 to some odd
17 years.
18     Q    Did you ever experience sexual harassment at
19 Al Dente?
20     A    No.
21     Q    Did you ever experience sexual harassment at
22 the next place you went, Merch?  Yeah?
23     A    No.
24     Q    Did you ever file any sort of complaint
25 against either of those employers?

|   |   | KIRA BOYLE - DECEMBER 12, 2022 | 63 |

```
                KIRA BOYLE - DECEMBER 12, 2022              63
 1      A    No.
 2      Q    Do you know an attorney named Maimon
 3 Kirschenbaum?
 4      A    No.
 5      Q    Do you an attorney named Matthew Marks?
 6      A    No.
 7           MR. FRIEDMAN:  I might, but it's
 8 unrelated.
 9           MS. MANBER:  Well, counsel's knowledge is
10 noted to the record.
11 BY MS. MANBER:
12      Q    All right.  Let's go back to -- one more
13 thing.  Do you remember where you working around 2014?
14      A    Probably Merch.
15      Q    Okay.  Where was Merch?
16      A    They were located in Hillside Avenue
17 somewhere.
18      Q    In Queens?
19      A    Yes.
20      Q    Do you remember who supervised you at Merch?
21      A    I was the head chef so I -- I supervised
22 myself.
23      Q    Okay.  Does the name William Reddy ring a
24 bell?
25      A    No.
```

```
                KIRA BOYLE - DECEMBER 12, 2022              64
1      Q    David Curran?
2      A    No.
3      Q    Jose Padilla Aries?
4      A    No.
5      Q    Chris David?
6      A    No.
7      Q    Who was your supervisor at Al Dente, if you
8   remember?
9      A    His name was Angelo.
10          MS. MANBER:  I'm going to share Exhibit
11  23 again.
12          THE WITNESS:  It disappeared.
13          MS. MANBER:  Yeah, I took it down.
14  Sorry.
15          THE WITNESS:  Oh.
16          MS. MANBER:  I'm going to mark another
17  exhibit.  Going to be 24.
18      (Exhibit 24 marked for identification.)
19  BY MS. MANBER:
20     Q    Ms. Boyle, we've marked as Exhibit 24 a
21  Complaint in Case Number 13-cv-02790 in Eastern District
22  of New York and my question is going to just be -- Ms.
23  Boyle, have you seen this before?
24     A    No.  Did you take it down again or?
25     Q    I did.  So just to be clear it's your
```

```
                    KIRA BOYLE - DECEMBER 12, 2022                65
 1    testimony that that was not you?  I can put it back up
 2    again.  That the Kira Boyle in Exhibit 24 was not you?
 3         A    No.  It was not.  I mean I know my name is
 4    rare, but I know there's people out there that do have
 5    my name.
 6              MS. MANBER:  Okay.  I'm going to show you
 7    another document.  We're going to mark this as 25 and
 8    this is a complaint filed in Supreme Court County of New
 9    York, Index Number 151463/2015.
10         (Exhibit 25 marked for identification.)
11    BY MS. MANBER:
12    Q    Ms. Boyle, have you seen this complaint before?
13         A    No.  I have not.
14         Q    I'm going to bring all to me, and do you see
15    where it says facts, and it says paragraph seven, "Kira
16    is a twenty-seven (27) year old lesbian female"?
17         A    I do.
18         Q    Approximately, how old were you in 2015?
19         A    I don't know.
20         Q    What year were you born?
21         A    1987.
22         Q    Okay.  So it's your testimony that this Kira
23    Boyle is not you?
24         A    No.  I'm actually trying to read it.  Now I
25    was being nosey.  No.  It's fine.  Don't worry.
```

|  | KIRA BOYLE - DECEMBER 12, 2022 | 66 |

1  Q  So let's go back to Exhibit 23.  I'm going to
2  take you to -- it's page 6 of the PDF, page 2150.  This
3  is where we left off before and Brown said, "I know
4  Because they are children who don't like having women
5  working in structure."  Do you see that?
6      A  I see it.
7      Q  Do you know what the basis was for Mr. Brown's
8  statement that they are children who don't like women
9  working in structure?
10     A  Can I read the text above it?
11     Q  Sure.
12     A  Okay.  What was the question again?
13     Q  Do you know what the basis was?  Did Mr. Brown
14 ever tell you what made him think that your coworkers
15 don't like having women working in structure?
16     A  What -- what was the basis for it?
17     Q  Right?
18     A  Because it was said in front of him before by
19 other coworkers that I shouldn't be working in
20 construction because I'm a female.
21     Q  Do you remember did he tell you what coworkers
22 said that?
23     A  Did he tell me which coworkers?
24     Q  Yes?
25     A  No.  He did not, but it was said to me from